**Lawrence D. McGILL,
Plaintiff-Appellant,**

v.

**Patricia Roberts HARRIS, Secretary of
Health, Education and Welfare,
Defendant-Appellee.**

No. 78–2311.

United States Court of Appeals,
Fifth Circuit.

April 11, 1980.

Shelley White, Robert B. Remar, Douglasville, Ga., W. David Arnold, Atlanta, Ga., for plaintiff-appellant.

William L. Harper, U. S. Atty., Joseph Griffin Doyle, Atlanta, Ga., for defendant-appellee.

Before COLEMAN, Chief Judge, REAVLEY, and ANDERSON, Circuit Judges.

PER CURIAM:

The issue in this appeal is whether Lawrence D. McGill was entitled to disability benefits under the Social Security Act for the period May 1, 1975 to February 28, 1977.

The District Court summarily affirmed a finding that McGill was not disabled within the meaning of §§ 416(i)(1) and 423(d)(1)(A) of the Act and thus was not entitled to disability insurance benefits. We remand for further hearing and findings.

McGill was born on July 10, 1932. Until forced to stop because of his physical condition, he worked most of his life as a housepainter. After he was no longer able to do that work, McGill got a job at a gas station but was dismissed because he could not count change. Although he attended school through the seventh grade, the fact is that he is totally illiterate.

In September 1974 McGill was hospitalized at the Georgia Baptist Hospital. He was overweight, had a pulse rate of 104 and a regular heartbeat. He had expiratory wheezes of the chest but no rales. The chest x-ray revealed chronic lung changes, with a small granuloma in the lower left lobe. The EKG was normal and there was no sign of congestive heart failure. Digoxin and diuretics were prescribed. As an outpatient, McGill ultimately came to a diagnosis of congestive heart failure of unknown etiology.

In November, 1974, McGill was readmitted to Georgia Baptist Hospital for chest pain, shortness of breath, and dizziness. The admission report stated that McGill had been a heavy smoker since the age of seven. The results of a cardiac catherization were essentially normal. The specialist who per-

formed the catherization concluded that the digoxin and diuretics were unnecessary and advised McGill to stop taking them. The final diagnosis was that McGill's shortness of breath resulted from a lung condition caused by his chronic smoking.

In May, 1975, a pulmonary function study showed that McGill had a moderate obstructive ventilatory defect which was partially reversed by bronchodilitation. A blood gases test revealed a low $PO_2$ with some secondary hypoventilation. An electroencephalogram and brain scan were normal. The final diagnosis was exogenous obesity, hypertension, and vascular headache. The physician recommended that McGill's hypertension be treated on an outpatient basis.

In three letters submitted to the Administrative Law Judge and made part of the record, McGill's otolaryngologist stated that because of McGill's severe dizziness, it was dangerous for him to climb ladders or scaffolding and that, therefore, he was unable to continue working as a housepainter. The doctor also wrote that McGill's dizziness made it very dangerous for him to work around machinery or any type of heights. The physician noted that McGill's headaches had become less painful.[1]

At the hearing before the ALJ, McGill and his wife testified concerning his various ailments and treatments. The stressed that McGill often suffered severe pain and dizziness. McGill added, however, that he was usually able to drive an automobile and go shopping with his wife.

The only other testimony at the hearing was offered by a vocational expert. In his opinion McGill was able to engage in sedentary work such as operating a semi-automatic machine in furniture-making, the electronics industry, a bakery, or any other automated industry. The vocational expert also testified that McGill could work as a night watchman or a door guard in a retail store. The expert added, however, *that because of McGill's illiteracy it was unlikely he would actually be hired for any of these jobs.* The vocational expert further stated that in his opinion McGill could not perform any of these jobs for eight hours a day.

The ALJ found that McGill was not disabled within the meaning of the Act and, therefore, denied him the benefits.

For the standards applicable to our review of such a case as we have here we need only turn to our recent decision in *Johnson v. Harris,* 612 F.2d 993 (5th Cir. 1980):

> The burden of a claimant to establish disability under the Act . . . is a very heavy one. . . . Not only must the claimant show that he has a medically determinable physical or mental impairment which has lasted or is suspected to continue for twelve months, he also must prove that he cannot find "substantial gainful work which exists in the national economy, regardless of whether * * * he would be hired if he applied for [such] work." . . .

> [T]he District Court can reverse [an adverse decision] only if it is not supported by substantial evidence. . . . The reviewing court may not reweigh the evidence nor substitute its judgment for that of the Secretary. . . . We only may question whether the District Court was correct in concluding that there was substantial evidence on which to base the finding of the ALJ. (Citations omitted.)

*Johnson v. Harris,* at pp. 996–997.

1. After the Appeals Council had rendered its decision but before McGill filed this complaint, Dr. C. G. Jordan of the Tate Clinic submitted a letter to the Appeals Council in which he wrote that for over a year he had been treating McGill for hypertension and headaches. Dr. Jordan stated that a recent pulmonary function study had revealed that McGill was suffering from chronic obstructive pulmonary disease. According to Dr. Jordan, McGill was also afflicted with Meniere's Disease. The Appeals Council acknowledged its receipt of this letter but stated that the additional information did not warrant changing the ALJ's decision. Dr. Jordan's letter was not included in the record below and apparently was not considered by the District Court.

Once a claimant "shows that he is disabled to the point that he can no longer perform his former job, the burden then shifts to the Secretary to show there is other gainful employment in the economy which the claimant can perform," *Johnson v. Harris, supra* at p. 997 (citations omitted).

This record shows beyond any real question that McGill can no longer function effectively as a housepainter. Indeed, the ALJ found that McGill's dizziness prevented him from working where heights were involved.

The testimony of the vocational expert that McGill could perform bench work involving automatic or semi-automatic machinery is contradicted by the medical evidence. McGill's otolaryngologist stated that McGill's severe dizziness made it dangerous for him to work around machinery. In this regard the ALJ found that the dizziness precluded McGill from working in the vicinity of dangerous machinery; however, the bench jobs enumerated by the vocational expert (furniture-making, electronics-manufacturing, baking, or any other automated industry) often involve working around dangerous machinery. In fact, the expert stated that McGill could operate an automatic saw in a furniture factory. Based on the medical evidence, this suggestion of the vocational expert is not supported by the medical evidence—it flies into the face of it.

The other jobs mentioned by the vocational expert were those of night watchman and door guard. The vocational expert described these jobs as follows:

[T]here are a variety of jobs that are light watchman jobs, but they're door guards. These jobs are often sedentary or allow a person to stand or sit and he simply watches the people who come in the front door to see if they have any packages that need to be examined prior to their going into the store. For instance, in K-Marts and other large retail stores, these door guards exist.

There is some question about whether he could do that, to be fair to Mr. McGill, because he cannot read or write. Generally, these door guards simply refer a person to the proper authority to have that package checked. Sometimes they simply stable a little slip of paper on it which seals the packages so that people can't put anything else in it.

In that same category, there are also night watchman jobs that are often sedentary where a person makes rounds and simply punches into a station. Sometimes those jobs require reading at a higher level than Mr. McGill has and sometimes they do not. It depends on the sophistication of that job.

(R. Vol. II, pp. 50–51).

The ALJ never specifically asked the vocational expert to consider McGill's age, education, and work experience in formulating his opinion as to whether McGill could perform either of these jobs. We repeat, the expert did testify that McGill probably could not work on a full-time, eight-hour basis.

On this record we follow the reasoning of the Court in *Johnson v. Harris, supra*. Accordingly, we reverse the summary judgment in favor of the Secretary and remand the case for a full and complete hearing before an Administrative Law Judge, where controlling principles may be correctly applied to the factual inquiry and correct standards applied in subsequent findings and decision.

REVERSED and REMANDED.